FEE PAID




Stephen Chahn Lee (State Bar: 336435)
slee@stephenleelaw.com
LAW OFFICE OF STEPHEN CHAHN LEE, LLC
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
Telephone: 312-436-1790

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA and THE STATE OF CALIFORNIA, ex rel. LINCOLN ANALYTICS, INC.

Plaintiffs,

v.

JACK AZAD, and JACK AZAD, M.D., INC. d/b/a "Tri-City Medical Group"

Defendants.

Case No. 2:22-CV-08437-SB(PLAx)

COMPLAINT

DEMAND FOR JURY TRIAL

FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730

## I. INTRODUCTION

1. *Qui tam* Plaintiff-Relator Lincoln Analytics, Inc., through its attorney, brings this Complaint on behalf of the United States, and on its own behalf, pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3730 *et seq.*

## II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and (b) over violations of the Federal False Claims Act.

3. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over violations of the California False Claims Act insofar as the claims for such violations are so related to claims in this action for violations of the Federal False Claims Act that they form part of the same case or controversy under Article III of the United States Constitution.

4. The Court has personal jurisdiction over the Defendants because Defendants transact business in this district, can be found in this district, and committed acts within this district that violate 31 U.S.C. § 3729.

5. Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because at all times relevant to this Complaint, Defendants regularly conducted substantial business within this district.

## III. PARTIES

6. Relator Lincoln Analytics, Inc. is a company that is incorporated in Delaware and that uses data and investigation to detect health care fraud. Relator has personal knowledge of the facts alleged in this Complaint, based on Relator's analysis of claims data and interviews conducted of multiple former employees of Defendants. Relator is not aware of any "public

disclosure" in connection with the false claims alleged in this Complaint, as defined in 31 U.S.C. § 3730(e)(4)(A).

7. Relator qualifies as an "original source" under 31 U.S.C. § 3730(e)(4)(B) because: (1) prior to any purported public disclosure, Relator voluntarily disclosed to the Government the information on which allegations or transactions in this claim are based, and/or (2) Relator has knowledge which is both direct and independent of any public disclosures to the extent any may exist, and Relator voluntarily provided the information to the Government before filing this action.

8. Defendant Jack Azad is licensed as a physician and surgeon in California. According to information on the Medical Board of California's website, Azad was issued a license in 1995 and the license expires in March 2023. According to information on the Medical Board of California's website, Azad was previously known by the name Jack Vossoughazad.

9. Defendant Jack Azad, M.D., Inc., d/b/a Tri-City Medical Group is a company that is incorporated in California. According to a statement of information filed in June 2021 with the California Secretary of State, Jack Azad, M.D., Inc, s principal address is 11900 Avalon Blvd, #101, Los Angeles, CA. According to the statement of information, Jack Azad is the CEO, Secretary, Chief Financial Officer, Director, and Agent for Service of Process for Jack Azad, M.D., Inc.

10. Despite billing Medicare for millions of dollars per year in recent years, Defendant Jack Azad, M.D., Inc., d/b/a Tri-City Medical Group, has an office consisting of only a few rooms and shares space with another company. The company does not have a website and occupies a run-down building in a high-crime neighborhood in South Los Angeles.

**IV. MEDICARE BACKGROUND**

11. In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*., known as the Medicare program. The Center for Medicare and Medicaid Services ("CMS"), which is part of the Department of Health and Human Services ("HHS"), administers Medicare.

12. Medicare is a health care benefit program within the meaning of 18 U.S.C. ' 24(b). Medicare provides free or below-cost healthcare benefits to certain eligible beneficiaries, primarily persons sixty-five years of age or older. Individuals who receive Medicare benefits are often referred to as Medicare beneficiaries.

13. Medicare consists of four distinct parts, two of which are relevant here. Part A provides for home health care, and Part B provides supplementary medical insurance for physician services, outpatient services, and certain home health and preventive services.

14. Centers for Medicare and Medicaid Services, a federal agency within the United States Department of Health and Human Services, administers the Medicare program. CMS contracts with public and private organizations, usually health insurance carriers, to process Medicare claims and perform administrative functions such as paying Part B claims from the Medicare Trust Fund. The Medicare Trust Fund is a reserve of monies provided by the federal government.

15. Enrolled providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing reimbursement, to keep and allow access to records and information as required by Medicare, and to not present or cause to be presented false or fraudulent claims for payment to Medicare.

16. Medicare providers are obligated to understand and certify their compliance with all applicable Medicare laws, regulations, and program instructions as a condition of participation in Part B and as a condition of payment of Medicare reimbursements.

17. To seek payment from Medicare, providers of health care services to Medicare beneficiaries seeking reimbursement under the program must submit a claim, which is a CMS 1500, with certain information regarding the Medicare beneficiary, including the beneficiary's name, health insurance claim number, date the service was rendered, location where the service was rendered, type of services provided, number of services rendered, the procedure code (described further below), a diagnosis code, charges for each service provided, and a certification that such services were personally rendered by that provider.

18. The American Medical Association has established certain codes to identify medical services and procedures performed by physicians, which are collectively known as the Current Procedural Terminology system. The CPT system provides a national correct coding practice for reporting services performed by physicians and for payment of Medicare claims. CPT codes are widely used and accepted by health care providers and insurers, including Medicare and other health care benefit programs.

19. Given the volume of claims that are submitted to Medicare, Medicare relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims. Typically, Medicare pays claims without any review of supporting documentation, including medical records.

**V. MEDI-CAL BACKGROUND**

20. Medi-Cal is California's Medicaid program. Medi-Cal is a public health insurance program that pays for healthcare services for persons who qualify for Medicaid coverage, primarily families with children and people with low income.

21. Medi-Cal is financed and administered by the California Department of Health Care Services and CMS.

22. Before billing Medi-Cal assignments, Defendants, and all providers who submit claims for services provided to Medi-Cal beneficiaries, must certify that they will operate in accordance with the requirements established by the Secretary of the Department of Health and Human Services.

**V. THE FEDERAL AND CALIFORNIA FALSE CLAIMS ACTS**

23. Under the False Claims Act (31 U.S.C. § 3279 *et seq*.), any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" is liable to the United States Government for a civil penalty plus three times the amount of damages which the Government sustained because of such person's acts.

24. Under 31 U.S.C. § 3730(b), any person may bring a civil action for a violation of section 3729 for that person and for the United States government, and such action shall be brought in the name of the United States government.

25. Under the California False Claims Act, Cal. Gov. Code 12651, any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be liable to the state for a civil penalty plus three times the amount of damages which the State sustained because of such person's acts.

26. Under Cal. Gov. Code 12652(c), any person may bring a civil action for a violation of the California False Claims Act for that person and for the State of California, and such action shall be brought in the name of the State of California.

## VI. SUBMISSION OF FALSE CLAIMS FOR TESTS AND VISITS

27. As described in more detail below, on information and belief, Defendants Azad and Jack Azad, M.C., Inc. have submitted false claims to Medicare and Medicaid for multiple tests that were not medically necessary and thus did not qualify for payment. Defendants also have submitted false claims to Medicare and Medicaid for home and office visits that were not rendered by Defendant Azad or by someone who was properly acting under his supervision.

28. Defendants trained and instructed students and staff to conduct patient visits without him. Defendants also trained and instructed students and staff to document their work as if Defendant Azad had performed the medical visit himself. Defendants billed the visits as if they had been performed by Defendant Azad when he had not rendered the visit and when the visit did not qualify for billing as an incident-to service.

### A. Nervous-System Tests That Were Not Reasonable or Medically Necessary

29. According to a review of Medicare claims data, Defendant Azad began billing for tests of autonomic nervous system function in 2016. He had billed no such tests to Medicare in 2013, 2014 or 2015, but quickly began billing large numbers of such services. In 2019, he billed almost 5,000 such tests alone, indicating that he rendered more than 12 such tests every single day of that year. Figure 1 shows Defendant Azad's rapid growth in nervous system testing.

Figure 1: Defendant Azad Nervous System Tests by Year




30. According to a review of publicly available data, Defendant Azad was the top biller for such nervous-system tests in 2019. In that year, he billed approximately 2,462 such tests using CPT code 95921 and approximately 2,460 such tests using CPT code 95923 to Medicare.

31. No neurologist billed Medicare for as many nervous-system tests as Defendant Azad. The top neurologist for billing such tests using CPT code 95921 billed approximately 1,076 tests, less than half the amount that Defendant Azad billed to Medicare, and the top neurologist for billing such tests using CPT code 95923 billed approximately 1,349 such tests, or about 45 percent less than Defendant Azad.

32. Figure 2 shows the spending on nervous system testing across all physicians from 2018-2020. Defendant Azad is an extreme outlier, having been paid by Medicare for $941,413.59 in those three years. The next-highest provider only billed for $589,590.31 in the same time period. The total payment to Defendant Azad is more than 150% that to the next-highest provider.



Figure 2: Nervous System Testing Across Physicians, 2018 through 2020




33. On behalf of Medicare, a contractor has issued a Local Coverage Determination for autonomic function testing such as the nervous system tests billed by Defendants. The original version of LCD 35124 was effective from 2015 to 2019 (available online at (https://localcoverage.cms.gov/mcd_archive/view/lcd.aspx?lcdInfo=35124:19) and the revised version was effective 2019 through the present (available online at https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35124).

34. According to the original and revised versions of LCD 35124, nervous system testing should be "relatively rare" and should only be done "after excluding more common causes of autonomic signs or symptoms (e.g., hypotension, hyperhidrosis, and orthostatic tachycardia)."

35. According to the original and revised versions of LCD 35124, autonomic function testing is only covered as "reasonable and necessary when used as a diagnostic tool" and the "the ANS testing is directed at establishing a more accurate or definitive diagnosis or contributing to

clinically useful and relevant medical decision making for one of the following indications" such as diagnosing "the presence of autonomic neuropathy in a patient with signs or symptoms suggesting a progressive autonomic neuropathy" or evaluating "patients with recurrent unexplained syncope or demonstrate autonomic failure, after more common causes have been excluded by other standard testing."

36. According to the original and revised versions of LCD 35124, the following conditions are considered "not medically reasonable and necessary and will not be covered":

1. "Screening patients without signs or symptoms of autonomic dysfunction, including patients with diabetes, hepatic or renal disease.
2. "Testing for the sole purpose of monitoring disease intensity or treatment efficacy in diabetes, hepatic or renal disease.
3. "Testing results that are not used in clinical decision-making or patient management.
4. "Testing performed by physicians who do not have evidence of training, and expertise to perform and interpret these tests…"

37. Defendants billed tests that were reasonable or medically necessary and that did not qualify for payment under LCD 35124.

38. Employees of Defendants ordered patients to receive tests that were billed as nervous-system tests when such tests were not reasonable or medically necessary. Employees of Defendants were trained to order tests for common conditions such as headaches, rather than only after common causes of autonomic signs or symptoms had been excluded.

39. In total, Defendants have been paid more than $1.1 million by Medicare for such nervous system tests from 2013-2020, according to a review of publicly available Medicare data.

40. On information and belief, Defendants Azad and Jack Azad, M.D., Inc. caused improper claims for nervous-system tests to be submitted to Medicare and Medicaid because they were not reasonable or medically necessary and did not qualify for payment.

B. Eye-Movement Tests That Were Not Reasonable or Medically Necessary

41. According to a review of Medicare claims data, Defendant Azad began tests for abnormal eye movement using CPT codes 92540 and 92546 in 2018. He had billed no such tests to Medicare in 2013, 2014, 2015, 2016 or 2017, but quickly began billing large numbers of such services. In 2019, he billed more than 4,000 such tests alone. Figure 3 shows the pattern of Defendant Azad's eye movement tests from 2013 to 2020.

Figure 3: Annual Eye Movement Tests by Defendant Azad




42. According to a review of publicly available data, Defendant Azad was the top biller for such eye-movement tests in 2019. In that year, he billed approximately 2,252 such tests using CPT code 92540 and approximately 2,460 such tests using CPT code 92546 to Medicare.

43. No neurologist billed Medicare for as many eye-movement tests as Defendant Azad. The top neurologist for billing such tests using CPT code 92540 billed approximately 1,002 tests, less than half the amount that Defendant Azad billed to Medicare, and the top neurologist for billing such tests using CPT code 92546 billed approximately 1,349 such tests, or about 45 percent less than Defendant Azad.

44. Figure 4 shows the comparison of spending on CPT code 92540 and 92546 eye movement tests by physician, combining data from 2018, 2019, and 2020. Defendant Azad was the highest biller for these tests in this time period, being paid approximately $716,123.76 in three years. The next highest provider billed only $445,576.67 in the same period. As shown in Figure 4, Defendant Azad is an extreme outlier.

Figure 4: Eye Movement Tests by Physicians, 2018-2020




---

45. Employees of Defendants ordered patients to receive tests that were billed as eye-movement tests when such tests were not reasonable or medically necessary. Employees of Defendants were trained to order such tests on a regular basis, rather than based on a true intent to determine if determine if there was a problem with the vestibular portion of the brainstem and inner ear.

46. In total, Defendants have been paid more than $700,000 for such eye movement tests from 2018 through 2020, according to a review of publicly available Medicare data.

47. On information and belief, Defendants Azad and Jack Azad, M.C., Inc. caused improper claims for eye-movement tests to be submitted to Medicare and Medicaid because they were not reasonable or medically necessary and did not qualify for payment.

C. Unnecessary Pap Smears and Other Tests

48. Defendants Azad and Jack Azad, M.C., Inc. have also billed Medicare and Medicaid for other unnecessary tests. For example, on information and belief, Defendants have submitted claims for pap smear tests that were ordered on a routine basis for all female patients, including elderly female patients.

D. Office and Home Visits and Care Plan Oversight

49. Defendants have billed office and home visits to Medicare and Medicaid as if Defendant Azad had rendered the visits, when in fact the visits were rendered by students and staff or were not rendered at all and should not have been billed.

50. According to a review of Medicare claims data, Defendant Azad began conducting home visits with Medicare patients in 2014. In 2013, he billed no home visits to Medicare, but quickly began billing large numbers of such visits. In 2017 alone, he billed more than 4,000 home visits to Medicare, indicating that he rendered more than 10 home visits every single day of that year. Figure 5 shows the number of home visits billed to Medicare each year.

Figure 5: Home Visits Billed to Medicare by Year




51. In total, Defendants have been paid by Medicare more than $1.5 million for such home visits, according to a review of publicly available Medicare data.

52. According to Medicare rules, Medicare will pay for visits and other services rendered by an employee of a physician, as opposed to by the physician himself or herself, only when all the criteria for "incident to" services are met.

53. According to the guidance by Medicare contractor Noridian (https://med.noridianmedicare.com/web/jeb/topics/incident-to-services), one criteria for "incident to" services that are provided in a patient's home is that the physician "must be present in the patient's home." The only exception to this requirement is if the patient is in a "medically underserved" area.

54. In fact, Defendants regularly bill to Medicare home visits in Defendant Azad's name that are conducted by nurse practitioners and other staff when Defendant Azad was not in the patient's home and was thus not providing "direct supervision." Such visits would qualify for payment only if the patient was in a medically underserved area.

55. On information and belief, some of the home visits billed by Defendants to Medicare did not qualify for payment because they were rendered by nurse practitioners and other staff without Defendant Azad being present and because the visits were not in a medically underserved area, and thus did not qualify for "incident to" services.

56. Regarding office visits billed as "incident to" services, according to the guidance by Medicare contractor Noridian (https://med.noridianmedicare.com/web/jeb/topics/incident-to-services), one criteria is that the services are rendered under the "direct supervision" of the physician, which means that the physician must be "present in the office suite and immediately available to provide assistance and direction throughout the time the employee is performing the services."

57. In fact, Defendants bill office visits that are conducted when Defendant Azad was not in the office and was thus not providing "direct supervision."

58. Another criteria for "incident to" services, according to the guidance by Medicare contractor Noridian (https://med.noridianmedicare.com/web/jeb/topics/incident-to-services), is that the services are rendered by a clinical psychologist, nurse practitioner, certified nurse midwife, or clinical nurse specialist, or a physician assistant in some circumstances. Services of a student are not covered.

59. In fact, Defendants bill visits that are conducted by students from local schools as if they were performed by Defendant Azad or were performed in compliance with "incident to" criteria.

60. In addition to the falsified home and office visit claims, Defendants billed Medicare for Care Plan Oversight services, HCPCS Code G0181, for overseeing home health care.

Defendants billed 5,569 services in 2017 for which Medicare paid $441,658.56, and 8,270 services in 2018 for which Medicare paid $683,067.87.

61. Care Plan Oversight services require 30 minutes of work to justify a Medicare claim. At 8,270 services in calendar year 2018, Defendant Azad billed for the equivalent of 4,135 hours of work, or over 11 hours of Care Plan oversight work on average per day for all 365 days of the year. This is in addition to billing for home visits, office visits, and tests conducted. In 2018, Defendant Azad was the second highest biller for Care Plan Oversight services among all Medicare providers.

62. On information and belief, Defendants billed Medicare for care plan oversight services that were not actually rendered by Defendant Azad.

## VIII. FIRST CAUSE OF ACTION

63. Relator repeats and realleges the preceding paragraphs as if fully set forth herein.

64. All Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

65. As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, damaged.

## VIII. SECOND CAUSE OF ACTION

66. Relator repeats and realleges the preceding paragraphs as if fully set forth herein. All Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, to the State of California false or fraudulent claims for payment or approval, in violation of Cal. Gov. Code 12651.

67. As a result of Defendants' actions, as set forth above, the State of California has been, and may continue to be, damaged.

## VIII. PRAYER FOR RELIEF

68. WHEREFORE, *Qui Tam* Plaintiff, Lincoln Analytics, Inc., for the United States, and for itself, prays as follows and request:

a. That the Court enter judgment against the Defendants in an amount to be determined at trial, equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

b. That in the event the United States Government intervenes in this action, Lincoln Analytics, Inc. be awarded 25% of the proceeds of the action or the settlement of any such claim;

c. That in the event the United States Government does not proceed with this action, Lincoln Analytics, Inc. be awarded 30% of the proceeds of this action or the settlement of any such claim;

69. WHEREFORE, *Qui Tam* Plaintiff, Lincoln Analytics, Inc., for the State of California, and for itself, prays as follows and request:

a. That the Court enter judgment against the Defendants in an amount to be determined at trial, equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty for each action in violation of Cal. Gov. Code 12651, and the costs of this action, with interest, including the costs to the State of California for its expenses related to this action;

b. That in the event the State of California intervenes in this action, Lincoln Analytics, Inc. be awarded at least 15 percent but not more than 33 percent of the proceeds of the action or the settlement of any such claim;

c. That in the event the State of California does not proceed with this action, Lincoln Analytics, Inc. be awarded at least 25 percent but not more than 50 percent of the proceeds of this action or the settlement of any such claim;

70. That the Court award an alternate remedy or other such other relief as is appropriate.

71. That Lincoln Analytics, Inc. be awarded all costs, attorneys' fees, and litigation expenses of this action.

72. That the United States Government, the State of California, and Lincoln Analytics, Inc. receive any and all other relief, both at law and in equity, to which they may reasonably appear entitled.

## IX. JURY DEMAND

73. Pursuant to Federal Rule of Civil Procedure 38(d), Relator demands a trial by jury for all claims and issues so triable.

Dated: November 18, 2022

Respectfully submitted,

LAW OFFICE OF STEPHEN CHAHN LEE, LLC
209 S. LaSalle St, Suite 950
Chicago, IL, 60604
Tel: 312-436-1790

By: /s/ Stephen Chahn Lee
STEPHEN CHAHN LEE
State Bar No. 336435
E-mail: slee@stephenleelaw.com

Attorney for Relator